FILED

2014 Jul-03  PM 04:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

JEFFERY NEWSOME,       )
                             )
        Plaintiff,       )
                             )
vs.                      )     Case No. 4:12-cv-00019-VEH-JEO
                             )
OFFICER RUSSELL JONES, *et al*.,   )
                             )
        Defendants.     )

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff, Jeffery Newsome, filed this *pro se* action pursuant to 42 U.S.C. § 1983, alleging that he had been deprived of rights, privileges, or immunities afforded him under the Constitution or laws of the United States of America during his incarceration at the St. Clair Correctional Facility in Springville, Alabama.  Named as defendants in the amended complaint are Correctional Officer Brandon Landers; Correctional Officer Russell Jones; Nurse Edwina Thomas; Nurse Dana Johnson; Lieutenant LaTonya Scott; Lieutenant Jerome Gray; Sergeant William Northcutt; Sergeant Jason McDowell; Correctional Officer (Retired) Sidney Jackson; Correctional Officer Christopher Dakin; Correctional Sergeant Jamey Hopkins; Correctional Officer Jeremy Simmons; Correctional Officer Andres Marcano; Correctional Officer George Denson; Correctional Lieutenant William Morris; and Correctional Warden II Joseph Headley.[1] The plaintiff seeks compensatory and punitive damages, as well as declaratory and injunctive relief.  In accordance with the usual practices of this court and 28 U.S.C. § 636(b)(2), the complaint was referred to the undersigned

---

[1]Pursuant to the plaintiff's motion, defendants Headley, Simmons, and McDowell were dismissed by order dated July 10, 2012.  (Doc. 29).

magistrate judge for a preliminary report and recommendation.  *See McCarthy v. Bronson*, 500 U.S. 136 (1991).

## CASE HISTORY

On February 9, 2012, the court entered an Order for Special Report directing that copies of the complaint be forwarded to the defendants and requesting they file a special report addressing the plaintiff's factual allegations.[2]  The parties were advised that the special report, if appropriate, might be considered as a motion for summary judgment filed pursuant to Rule 56 of the FEDERAL RULES OF CIVIL PROCEDURE.  On April 9, 2012, the medical defendants filed a special report accompanied by affidavits and copies of certain medical records pertaining to the plaintiff.  (Doc. 14).  On May 9, 2012, the correctional defendants filed a special report, accompanied by affidavits and copies of certain administrative and medical records pertaining to the plaintiff and the events made the basis of his claims.  (Doc. 18).  The correctional defendants supplemented their special report on July 30, 2012, by submitting photographs of the plaintiff taken August 13, 2011, and photographs of contraband alleged to have been confiscated from the plaintiff that same day.  (Doc. 30). The medical defendants supplemented their special report on August 6, 2012, by submitting the affidavit of Administrative Assistant Lisa Lemons.  (Doc. 33).  Defendants Jones, Landers, and Denson supplemented their special report on August 9, 2012, in order to address the plaintiff's state-law assault and battery claim.  (Doc. 36).

---

[2]Lieutenant William Morris was added as a defendant on March 9, 2012.  (Doc. 11).

On January 7, 2013, the parties were notified that the court would construe the defendants' special reports as a motion for summary judgment and the plaintiff was notified that he would have twenty days to respond to the motion by filing affidavits or other material if he chose. The plaintiff was advised of the consequences of any default or failure to comply with FED. R. CIV. P. 56. *See Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985). The plaintiff filed a response to the defendants' motion for summary judgment on January 31, 2013. (Doc. 43).[3] This matter is now before the court on the defendants' special reports as supplemented (documents 14, 18, 30, 33, and 36) being construed as a motion for summary judgment, and the plaintiff's response thereto (doc. 43 and 48).

## SUMMARY JUDGMENT STANDARD

Because the special report of the defendants is being considered a motion for summary judgment, the Court must determine whether the moving party, the defendants, are entitled to judgment as a matter of law. Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. FEDERAL RULE OF CIVIL PROCEDURE 56. In making that assessment, the Court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). Once that initial

---

[3]A notarized copy of the first thirteen pages of this document was submitted on May 30, 2014. (Doc. 48).

3

burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial, and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [citations omitted]. Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

898 F.2d at 1532.

## **PLAINTIFF'S FACTS**

The plaintiff is an inmate in the custody of the Alabama Department of Corrections and is presently housed in the Donaldson Correctional Facility in Bessemer, Alabama. However, his complaint concerns events which allegedly occurred while he was housed in the St. Clair Correctional Facility in Springville, Alabama. On August 13, 2011, the plaintiff was approached by Officer Landers on the visiting yard and escorted to a "shake down area," where he was told to remove his clothing in order to be searched. (Doc. 1). He was initially

ordered to turn completely around one full turn, with which he complied. (*Id*. at 5). However, he refused an order to bend over to allow a body cavity search, at which point Landers grabbed him by the throat, slammed him against a wall, and started hitting him repeatedly on the face and head. (*Id*. at 5). Landers was then joined by Officer Jones who allegedly began striking the plaintiff with his fist and feet. (*Id*.) As a result of the blows, the plaintiff defecated on himself and eventually became unconscious. (*Id*.) When he regained consciousness, he was laying on his stomach face down in blood and feces, with Officer Landers hitting him on the back of the head. (*Id*.) Other officers, including Officer Denson, also jumped on the plaintiff's back until Lieutenant Morris appeared on the scene and told them "that's enough." (*Id*.)

The plaintiff was then "dragged" to the infirmary by Officers Simmons and Marcano and thrown on the floor, where he laid for approximately 45 minutes before being given treatment, and where Officers Landers and Jones kicked his legs and feet as they walked by. (Doc. 1).[4] The plaintiff states that Nurses Thomas and Johnson failed to treat him during this time, even though they observed him lying on the floor in the infirmary. (*Id*. at 8). He was finally taken to the treatment room where he received some medical attention for his injuries, which he alleges included a "busted" nose and jaw, multiple wounds to the head, a broken rib, a swollen eye, and a laceration at the top of his eyebrow. However, he complains he was not

---

[4]The ADOC Body Chart document prepared on the date of the incident shows a time of "12:38," which is approximately fifty-two (52) minutes after the 11:46 a.m. event. (Doc. 18-1 at 17). The body charts prepared with regard to Officers Landers and Jones show times of "12:00" and "12:15" respectively. (Doc. 18-1 at 19-20).

monitored for internal bleeding.  (*Id*. at 5-8).[5]  Although Nurse Thomas was going to admit the plaintiff into the prison hospital, Officers Landers and Jones advised her that the plaintiff was to be transported to an outside cage instead, where he would remain until he defecated into a bucket.  (*Id*.)  The plaintiff asserts that despite Nurse Thomas' knowledge of his pain and suffering, she allowed officers to remove him from the infirmary without consulting the Warden, a doctor, or the shift commander, which he contends violated his Eighth and Fourteenth Amendment rights.  (*Id*.)

Although he was allegedly suffering from numerous painful injuries, the plaintiff was taken to an outside cage on orders from Lt. Morris, where he remained in the heat of August for a period extending from approximately 1:30 p.m. to 9:30 p.m.  (Doc. 1 at 5-8; *see also* Doc. 8).[6]  The cage contained no chair, mattress, or water, and despite being covered in blood and feces, the plaintiff was not allowed a shower or clothing.  (*Id*. at 5-8).  He alleges he made numerous requests of Latonya Scott, Lt. Gray, and Sgt, Northcutt to be placed in a "dry cell" where he could lay down, and to be allowed a shower and water to drink.  (*Id*. at 5-6).  Although he was given "one small styrofoam cup of water" for the entire eight hours or more he was held in the cage, his other requests were denied.  (*Id*. at 6).  After approximately eight hours, the plaintiff was taken back to the infirmary complaining of a broken rib and coughing

---

[5]Most of these alleged injuries are not noted on the first "body chart" prepared the day of the event.  Instead, the only injuries listed are a 2cm laceration over the left eyebrow and a small abrasion on the left shoulder.  (Doc. 18-1 at 17).  The body chart also states "[no] acute distress noted."  (*Id*.)  However, as discussed herein, later body charts indicate additional injuries.

[6]Although the complaint asserts a 9:30 p.m. time at which the plaintiff was removed from the cage, it appears that all parties now agree that it was around midnight when the plaintiff was taken back to the infirmary.  (Doc. 18-1 at 5; Doc. 48 at 9).  In any event, this discrepancy does not affect the outcome of this report and recommendation.

up blood.  (*Id*. at 6).  Despite these seemingly serious symptoms, the plaintiff was only given two Advil by the nurse, and then placed in lock up.  (*Id*.)[7]

## DEFENDANTS' SPECIAL REPORTS

On August 13, 2011, Officers Landers and Jones were assigned as the Visitation Officers at the St. Clair facility.  (Doc. 18-10).  At approximately 11:46 a.m., Officer Landers observed the plaintiff on the outside visitation yard with a visitor, and became suspicious when the plaintiff began to act abnormally and was continually reaching behind his back.  (*Id*. at 1).  Landers asked the plaintiff to go to the "shakedown room" in order to be searched, and escorted him there for that purpose.  (*Id*.)  At the same time, Officer Jones was entering the search area and was asked by Landers to assist in performing a strip search of the plaintiff.  (*Id*.; Doc.18-9 at 1).[8]  When the plaintiff was instructed to remove his clothes, he became "very nervous and started to shake and tremble."  (Doc. 18-10 at 2; Doc. 18-9 at 1). While removing his clothes, the plaintiff allegedly reached around and put his hand inside his undershorts and "appeared to be attempting to push something into his rectum."  (*Id*.)  At that point, Jones placed his right hand on the plaintiff's chest, pushed him against the wall, and held onto his right hand, while Landers attempted to hold onto the plaintiff's left hand. (*Id*.)  The plaintiff then broke free and began "swinging wildly" at the Officers, hitting

---

[7]On this point, the plaintiff acknowledges that when he was eventually examined by a physician he was told that nothing could be done for a broken rib, other than to administer pain medications. (Doc. 1 at 6).  At that time, he was given a prescription for Advil.  (*Id*.)

[8]Jones testifies that Landers expressed suspicion that the plaintiff had inserted something into his rectum.  (Doc. 18-9 at 1).

7

Landers in the face, and slinging feces on both officers. (Doc. 18-10 at 2; Doc. 18-9 at 2).[9]

During the scuffle, Landers hit the plaintiff once in the face before he was eventually

wrestled to the floor and placed on his stomach by Jones, who called for assistance via a hand

held radio. (*Id*.) In response to the call for help, Officers Walker, Marcano, and McDowell

entered the shakedown area and the plaintiff was restrained. (*Id*.)[10] Shortly thereafter, the

plaintiff was escorted to the infirmary by Officers Marcano and McDowell.[11] Officers Jones

and Landers also went to the infirmary to be decontaminated because of their exposure to the

plaintiff's blood and feces. (*Id*.) Officers Marcano and McDowell state that they did not

witness any officer kicking or striking the plaintiff during the time he was in the medical unit.

(Doc. 18-11; Doc. 18-12).

    With respect to the events which occurred in the infirmary, Nurse Johnson testifies

that her only involvement with the plaintiff was to prepare a body chart documenting his

---

[9]According to a written report in connection with an August 27, 2011, disciplinary hearing, the plaintiff denied assaulting Officer Jones, but admitted "he did resist and feces went all over the room." (Doc. 18-1 at 11-13). In a disciplinary hearing conducted on August 26, 2011, the plaintiff allegedly acknowledged that he resisted Officer Landers, but denied punching him. (Doc. 18-1 at 14-15).

[10]Both Landers and Jones testify that all use of force ceased once the plaintiff was restrained. (Doc. 18-10 at 2; Doc. 18-9 at 2). Furthermore, Jones denies hitting or kicking the plaintiff, or interfering with the plaintiff's treatment by the medical staff, and Landers denies the allegation that he grabbed the plaintiff by the throat and shoved him against a wall. (*Id*.) Landers also denies kicking the plaintiff or interfering with the plaintiff's medical care, but does acknowledge hitting the plaintiff "once" in response to the plaintiff's blows. (*Id*.)

[11]Defendant Officer Denson, testifies that he did not enter the shakedown area until the plaintiff was already restrained and being escorted to the infirmary, that he had no physical contact with the plaintiff, and that he has no knowledge of what happened to the plaintiff after leaving the shakedown area. (Doc. 18-13). Sergeant LaTonya Scott states she reported to work at 6:00 p.m., and has no knowledge of the earlier incident. (Doc. 18-6).

injuries.[12]  (Doc. 14-4 at 2).  She noted a laceration to the plaintiff's left eyebrow and an abrasion to his shoulder, and states that he voiced no other complaints of injury.  (*Id.*)[13]  She acknowledges that the plaintiff may have "been required to wait for a period of time," but states that she evaluated him "as soon as [she] knew he was present and required evaluation." (*Id.*)[14]  Nurse Johnson states that the plaintiff has voiced no other complaints to her regarding the August 13, 2011, incident.

Nurse Thomas testifies that the plaintiff was initially evaluated by Nurse Johnson, during which time she (Thomas) was completing her evaluation of "the correctional officers who exhibited injuries."  (Doc. 14-1 at 5).[15]  At some point, another member of the nursing staff notified Thomas that the plaintiff had suffered a laceration over his left eye, at which

---

[12]Nurse Johnson states that actual treatment of the plaintiff's injuries was performed by other nurses.  (Doc. 14-4 at 2).

[13]The plaintiff was examined again shortly after midnight on August 14, 2011, at which time he complained of pain in his left lower rib area.  (Doc. 14-2 at 33).  The plaintiff was seen by a physician on August 23, 2011, at which time he was diagnosed with a likely contusion to the left side of his rib cage. was prescribed Motrin, and was scheduled to have a chest x-ray.  (Doc. 14-1 at 7; Doc. 14-2 at 27). However, the medical record reflects that the plaintiff refused to attend the x-ray scheduled the following day.  (Doc. 14-3 at 39).

[14]In this regard, Nurse Johnson does not *directly* refute the plaintiff's contention that he laid on the infirmary floor with multiple injuries in sight of the nurses for 45 minutes.  (Doc. 1 at 8).

[15]Nurse Thomas' affidavit also includes a discussion of the sick call and medical grievance procedure employed at the St. Clair Correctional Facility, and states that "[the plaintiff] did not file any grievances pursuant to the applicable grievance procedure" during the his incarceration at St. Clair. (Doc. 14-1 at 4).  However, Nurse Thomas does not show how she has personal knowledge of that fact, but instead asserts that "[t]he [Health Services Administrator] has reviewed the grievance records and logs for this facility and cannot locate any grievances filed by [the plaintiff] during his incarceration at St. Clair."  (*Id.* at 5).  The medical defendants therefore contend that the plaintiff has failed to exhaust administrative remedies as required by the Prison Litigation Reform Act.  (Doc. 14 at 12-15).  However, not only does the plaintiff state in his sworn complaint that he "filed a grievance on [the] medical staff," but Nurse Thomas' unsupported assertion and hearsay statement are not sufficient to carry the defendants' burden of proving this affirmative defense.

time Thomas contacted the site physician by telephone to determine if stitches would be required. (*Id*.) Based upon Thomas' description of the wound, the physician determined that it could be closed with "steri-strips;" a procedure that was performed by another member of the nursing staff. (*Id.*)

According to "standing protocols," the plaintiff was examined again by Nurse Thomas at 1:15 p.m. prior to his placement in segregation, at which time she noted the previously examined laceration above his left eye and the abrasion to his shoulder, along with an additional injury described as a moderate amount of swelling on the left side of his head above the ear. (Doc. 14-1 at 5-6; Doc. 14-2 at 8). However, Thomas denies that she notified officers of the plaintiff's need to remain in the infirmary in lieu of being sent to segregation. (*Id*. at 6). Although she acknowledges that she "expressed a need to hold [the plaintiff] in the health care unit for some period of time in order to contact [the] site physician for further instructions," she was not of the opinion that he should have been housed in the infirmary or that he needed "infirmary-type care of any kind." (*Id*. at 6).

Following the plaintiff's initial evaluation by the medical staff, he was escorted at 1:25 p.m. by Officers Marcano and McDowell to the segregation unit where he was placed on the walk yard and put under control of Officer Jackson. (Doc. 18-11; Doc. 18-12).[16] However, before placing the plaintiff inside the walk yard, Officer McDowell conducted a

---

[16]The plaintiff was taken to the segregation unit on orders from Lt. Morris. (Doc. 18-15). According to an incident report, he was placed in walk cage #2 and given a bucket in which to defecate to pass the suspected contraband. (Doc. 18-1 at 5).

search of the yard for contraband.  After turning control of the plaintiff over to Officer

Jackson, neither Marcano nor McDowell had any further involvement in the incident.

Officer Jackson testifies that he was assigned to watch the plaintiff on the segregation

walk yard from approximately 1:25 p.m. until 3:52 p.m., at which time he was relieved by

Officer Dakin.  (Doc. 18-2).[17]  Jackson confirms the plaintiff was informed that he could not

be placed in a cell until he defecated in a bucket, but does not recall the plaintiff asking to

be put into a dry cell or asking for water during the time he was assigned to monitor him.  (*Id*.

at 2).

Officer Dakin states that he and Officer Hopkins relieved Officer Jackson of

monitoring the plaintiff at 6:00 p.m. that evening.  (Doc. 18-3).[18]  He asserts that the only

injury he noticed on the plaintiff was a small bandage over the left eye.  (*Id*.)  He denies that

the plaintiff's eye was swollen shut, and states that there were no noticeable contusions on

the plaintiff's head and that his nose did not appear broken.  (*Id*.)[19]  However, Dakin

acknowledges that the plaintiff complained of side pain.  (*Id*.)  According to Dakin, the

plaintiff was provided water each time he requested, and he was not covered in blood and

---

[17]This is in contradiction to Officer Dakin's affidavit, in which he states that he and Officer
Hopkins relieved Officer Jackson at approximately 6:00 p.m.  (Doc. 18-3).

[18]Officer Hopkins offers more specific detail regarding his duties on the segregation walk yard
that evening.  He states that he did not monitor the plaintiff on a full time basis, but instead was assigned
as the segregation rover.  (Doc. 18-4).  He states that he would stop by and speak with Officer Dakin
during his rounds, where he observed the plaintiff in the outside cage, but was not assigned specifically
to watch the plaintiff.  *Id*.

[19]Officer Hopkins corroborates Dakin's testimony in this regard by confirming that the plaintiff
exhibited a small bandage on his left eye, but did not show signs that his eye was swollen shut, or that his
nose and jaw were broken.  (Doc. 18-4).  He also failed to notice any contusions on the plaintiff's head,
but confirms that the plaintiff complained of his side being sore.  *Id*. at 2.

feces.  (*Id*. at 1-2).  Officer Hopkins corroborates Dakin's testimony with regard to the plaintiff's observable injuries and physical appearance, and confirms the plaintiff was provided water "as needed," but acknowledges the plaintiff's assertion that the cage contained no chair or mattress on which to sit.  (Doc. 18-4).

At approximately 8:52 p.m., Officer Hopkins discovered a six-inch long, cylindrical package wrapped in black electrical tape in a drainage ditch between cages #2 and #3, and notified Sergeant Latonya Scott, who arrived on the scene with Lieutenant Gray shortly thereafter.  (Doc. 18-3 at 2).[20]  Officer Dakin opened the package and discovered what he describes as "a large amount of green leafy substance, five yellow pills, [nine] white and orange capsules, and three small packets of unidentified white powder."  (*Id*.)[21]  The plaintiff was then escorted by Officers Dakin and Hopkins to the infirmary at approximately 11:56 p.m., where he was given another medical evaluation by Nurse Sanders before being placed in a cell.  (*Id*.; Doc. 18-7 at 2).

## PLAINTIFF'S RESPONSE

The plaintiff directly disputes the defendants' special report and states unequivocally that Officer Landers grabbed him by the throat and slammed him against the wall, at which point both Landers and Jones started hitting him repeatedly, causing him to lose consciousness.  (Doc. 48 at 2).  The plaintiff denies throwing feces on the officers, but

---

[20]This event is described in Officer Dakin's affidavit.  Curiously, Officer Hopkins does not testify to these events in his affidavit, although he is identified as the one who found the contraband.

[21]Lieutenant Gray contacted Birmingham Poison Control to identify the pills and was told they were "Opana ER , Oxymorphone"  and "Oxycodone," both of which are schedule 2 substances.  (Doc. 18-7 at 2).

instead asserts that he involuntarily defecated on himself because of the severity of the beating. (*Id*. at 2 & 5). He contends that the beating lasted over five minutes, and only stopped because Lt. Morris entered the area and stated "alright, that's enough." (*Id*. at 4 & 6).

The plaintiff also directly refutes Officer Landers' testimony that he struck the officer with his left fist. The plaintiff states that his left hand is paralyzed from a military accident and consequently is unable to make a fist "due to nerve damage." (Doc. 48 at 5). This testimony is corroborated by the affidavit of inmate William Roberts, who was in the shakedown area and witnessed the incident. (Doc. 43 at 19-20). He states that the plaintiff stripped and was told by Landers to turn around and bend over. (*Id*. at 20). Roberts states that when the plaintiff refused to comply, Landers grabbed him by the throat, pinned him against the wall, and started punching him repeatedly with his fist. (*Id*.) Roberts also confirms that Jones started punching the plaintiff, causing the plaintiff to start "sliding down the wall to the floor," at which point "feces went everywhere." (*Id*. at 20). As the plaintiff lay on the floor in feces and blood, the officers continued to hit the plaintiff "over and over," despite the appearance that the plaintiff was unconscious. (*Id*.)

The plaintiff states that once the beating ceased he was handcuffed and taken "half-walking and half-dragged" to the infirmary, where he was placed on the floor, still bleeding from his left eye and nose. (Doc. 48 at 7). He alleges that Nurses Thomas and Johnson walked past him "numerous times" but rendered no aid for over forty (40) minutes until Officers Jones and Landers were cleaned up, despite the fact that he was "in far worse

13

condition" than the officers.[22]  (*Id*.)  As he lay on the floor in the hallway bleeding, the nurses did not bother to check where his bleeding was coming from, and Officers Landers and Jones kicked him several times as they walked past him.  (*Id*.)

The plaintiff was eventually taken to a treatment room, where an un-named nurse shaved his left eyebrow and applied steri-strips to attempt to close the wound there.  (Doc. 48 at 8).  Despite the fact that the plaintiff was also complaining of a broken rib, that injury "wasn't charted until the second body chart" that was prepared in the early morning hours of August 14.  (*Id*.; Doc. 43 at 15).  During this first examination, Nurse Thomas stated that the plaintiff would need to be placed in the infirmary, but she was overruled by Officer Landers who advised Nurse Thomas that the plaintiff was going to an outside cage.  (Doc. 48 at 8).

Despite the fact that he told officers that he needed further treatment, the plaintiff was taken in his underwear to an outside cage which consisted of a concrete floor, "with no chair, seat, mattress, water, or toilet," and was kept there from 1:25 p.m. until 12:00 a.m., where he continued to seek medical help and water from "every officer that passed."  (Doc. 48 at 9). [23]  Despite the fact that he "begged to be put in a dry cell" so he could lie down and get

---

[22]On this point, the medical records seem to corroborate the plaintiff's story.  As noted above in footnote #4, the body charts for Landers and Jones indicate times much earlier than the 12:38 p.m. time indicated on the plaintiff's body chart, which is nearly 52 minutes after the time of the incident.  The reasonable inference from these facts is that the plaintiff was ignored for a length of time despite his injuries.

[23]The plaintiff was given one cup of water and was told it was "up to him when he gets medical attention and water," referring to the fact that he needed to defecate in a bucket before he would be taken back to the infirmary where he could medical attention and liquids.  (Doc. 48 at 9).  Sergeant Northcutt would not allow the plaintiff to lay on the concrete floor of the cage, telling him that he would not be allowed to "get comfortable" and that "the treatment he was receiving was what he deserved."  (*Id*.)

medical attention, he was not removed from the cage until around midnight.  (*Id*. at 9).  At that point, he was taken back to the infirmary where a nurse prescribed Motrin before he was placed in segregation C-block, where he remained until at least January 23, 2013, the date he served his initial response to summary judgment.  (*Id*. at 9-10).[24]

Fellow inmate Jeffery Defee was being escorted to the infirmary on August 13, 2011, when he observed the plaintiff in his underwear being taken by officers to the outside cage. (Doc. 43 at 21).  He testifies that he observed the plaintiff with a "swollen busted eye," a swollen and bleeding face, and that he was coughing up blood.  (*Id*. at 21-22).  He also states that he heard the plaintiff asking the officers for medical attention but being told that "your stupid ass ain't going back to [the] infirmary until you sit on a bucket."  (*Id*. at 22).

## DISCUSSION

### A.    Excessive force claim

The Eighth Amendment's prohibition against cruel and unusual punishment is triggered when a prisoner is subjected to an "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).  When force is applied by prison officials, any Eighth Amendment inquiry must concentrate on whether the force was applied in a good faith effort to maintain discipline, or was carried out maliciously or sadistically for the purpose of causing harm.  *Id*. at 320.  In *Hudson v. McMillian*, the Supreme Court set out certain factors that should be considered in evaluating whether the use of force was wanton and unnecessary.  They include: (1) the need for the application of force; (2) the relationship

---

[24]The body chart prepared at that time notes the plaintiff's complaint of pain in his left lower rib area.  (Doc. 43 at 15).

between the need and the amount of force used; (3) the threat reasonably perceived by the prison official; (4) any efforts made to temper the severity of a forceful response; and, (5) the extent of the injury suffered by the inmate.  503 U.S. 1, 7 (1992).[25]

Applying these standards to the facts before the court, it is clear that genuine issues of fact exist with respect to the plaintiff's Eighth Amendment excessive force claim against Officers Landers and Jones, which therefore precludes summary judgment at this time.  The plaintiff's sworn complaint and subsequent affidavit set out specific and detailed facts surrounding the events made the basis of this action.  In both the initial complaint and his affidavit, the plaintiff states that although he refused the order to bend over and spread his buttocks, he did not hit the officers as they claim.  Instead, the plaintiff states unequivocally that he was punched and kicked by the officers in apparent retaliation for his making a mocking remark about one of the officers being gay.[26]  Although the defendants allege that the plaintiff attempted to hide something in his rectum and then hit Officer Landers in the face, the plaintiff directly refutes these assertions with his own and a fellow inmate's testimony.  Based upon the record before the court, it seems clear that a reasonable jury could find that the plaintiff presented no real physical threat to the two larger officers at the time and that the amount of force used against him was unnecessary and excessive under the

---

[25]The Court in *Hudson* made it clear that the absence of serious injury is relevant to an Eighth Amendment inquiry but is not conclusive.  503 U.S. at 7.

[26]The plaintiff states that when Landers asked him to bend over and spread his buttocks, he asked Landers if he was "gay or what?"  (Doc. 48 at 6).

circumstances.[27]  The plaintiff's allegations, taken as true for purposes of summary judgment, show no need for the application of force, much less to the extent allegedly administered, and it seems clear that a reasonable jury could find that force was applied for reasons other than a good faith effort to maintain security or discipline.  The defendants' allegation that the plaintiff pulled away and swung his fist, an allegation denied by the plaintiff, at most creates an issue of fact to be resolved at trial.  Accordingly, the undersigned recommends that Officers Landers and Jones' motion for summary judgment with respect to the excessive force claims be denied.

**B.**    **Medical claim against medical staff**

The plaintiff's claims against members of the prison medical staff, Nurses Thomas and Johnson, are that they ignored him as he lay on the infirmary floor injured and bleeding for approximately forty minutes, that they ignored his complaints of rib pain until he was examined again ten hours later, and that they allowed correctional staff to place the plaintiff in the outside cage, despite his serious injuries and his need to remain in the infirmary. Sufficient issues of fact exist with respect to these claims such that summary judgment is not proper at this time.

Our courts have long recognized that the government has an obligation to provide medical care for those it has incarcerated and that inmates must necessarily rely on prison authorities to meet their medical needs as those needs arise.  *Estelle v. Gamble*, 429 U.S. 97,

---

[27]An additional element of the plaintiff's excessive force claim involves the allegation that Officers Landers and Jones kicked him several times as he lay handcuffed and injured in the medical unit hallway.  The defendants' general denial of these allegations simply creates a genuine issue for the trier of fact.

103 (1976). Therefore, a prison official's deliberate indifference to the serious medical needs of prisoners violates the Eighth Amendment. *Id*. at 104. In the medical context, deliberate indifference is characterized by a prison official who, having knowledge of a prisoner's serious medical need, intentionally or recklessly denies or delays access to care. *See McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999); *quoting, Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997) ("[A]n official acts with deliberate indifference when he knows that an inmate is in serious need of medical care, but fails or refuses to obtain medical treatment for the inmate"). Depending on the circumstances, even brief delays in obtaining or providing medical care for a prisoner's serious injury can constitute an actionable Eighth Amendment violation.[28] This is true because courts recognize the "core principle" that prison officials may not "needlessly" cause a prisoner to suffer pain as a result of illness or injury, since such pain serves no valid penological purpose. *McElligott*, 182 F.3d at 1257. Accordingly, " a prisoner who suffers pain needlessly when relief is readily available has a cause of action against those whose deliberate indifference is the cause of his suffering. " *Id*. (quoting *Boretti v. Wiscomb*, 930 F.2d 1150, 1154-55 (6th Cir. 1991)).

---

[28]Where an inmate has suffered a serious and painful injury, "it may be that deliberately indifferent delay, *no matter how brief*," would render the defendants liable as if they had inflicted the pain themselves." *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) (emphasis added). In that regard, "the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *McElligott*, 182 F.3d at 1255. Therefore, "both long and short delays can be inexcusable." *Alsobrook v. Alvarado*, 477 F. App'x. 710, 713 (11th Cir. 2012) (citing *Harris v. Coweta County*, 21 F.3d 388, 393-94 (11th Cir. 1994)).

In this instance, although Nurses Thomas and Johnson fail to acknowledge some of the injuries alleged by the plaintiff (and noted on subsequent medical records), it is undisputed that he was initially brought to the infirmary with a laceration serious enough to possibly require sutures, and that he sustained abrasions to his shoulder and moderate swelling to the left side of the head.  (Doc. 14-1 at 5).[29]  Furthermore, the defendants fail to directly refute the plaintiff's assertions that he laid on the infirmary floor with these serious injuries for approximately forty minutes before receiving any attention from the nurses.  Although Nurse Johnson acknowledges that the plaintiff "may have been required to wait for a period of time" (doc. 14-4 at 2), neither she nor Nurse Thomas adequately explain the delay.   Furthermore, although Nurse Thomas denies the plaintiff's assertion that she expressed a need for the plaintiff to remain in the infirmary, she acknowledges that she "expressed a need to hold Mr. Newsome in the health care unit for some period of time in order to contact [the] site physician to receive further instructions."  (Doc. 14-1 at 6).  Not only does this statement create the reasonable inference that the plaintiff's injuries may have required further treatment beyond what had already been performed, but a genuine issue of fact is created by the plaintiff's testimony indicating that Officer Landers overruled Nurse Thomas' recommendation by stating that the plaintiff "isn't going in a cell, he is going to an outside cage."  (Doc. 48 at 8).

---

[29]The moderate swelling to the plaintiff's head wasn't noted until the second "body chart" was prepared at approximately 1:15 p.m., just prior to his being placed in the cage.  (Doc. 14 at 8; Doc. 14-1 at 5; Doc. 14-2 at  8).  The defendants have not alleged, nor do the first two body charts state, that the plaintiff was provided any pain medication before being placed in the cage.

The Eleventh Circuit has noted that when prison staff members "ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference." *Brown*, 894 F.2d at 1538. At the very least, a genuine issue of fact exist with respect to the defendants' knowledge or awareness of the plaintiff's injury, and whether or not the delay in responding to that injury is adequately explained. Additionally, a genuine issue of fact exist with respect to whether the medical staff allowed correctional officers to overrule their recommendation that the plaintiff remain in the infirmary. A reasonable jury could conclude that the plaintiff suffered needless pain as a result of the delay in addressing his injury, and as a result of being removed from the infirmary and placed in a bare outdoor cage, and that such delay and/or removal was the result of deliberate indifference on part of the medical staff. Accordingly, the magistrate judge recommends that Nurses Thomas and Johnson's motion for summary judgment be denied.

## C.   **Medical claim against correctional staff**

In *Estelle*, *supra*, the Supreme Court recognized that deliberate indifference to a prisoner's serious medical need constitutes the unnecessary and wanton infliction of pain, "whether the indifference is manifested by prison doctors in their response to a prisoner's needs *or by prison guards in intentionally denying or delaying access to medical care*." 429 U.S. at 104-05 (emphasis added). In this instance, genuine issues of fact exist with respect to whether certain of the correctional defendants denied the plaintiff further medical care for his alleged injuries despite the medical department's opinion to the contrary and despite his

verbalized requests that he needed further help.  In that regard, the plaintiff asserts that nurses in the infirmary were overruled by correctional officers with respect to his need to remain there because of his injury.  At the very least, there remains a genuine issue of fact with respect to the plaintiff's assertion that Officers Landers and Jones overruled Nurse Thomas when she suggested the plaintiff be admitted to the prison hospital.  Additionally, Officer Marcano escorted the plaintiff to the outside cage despite the fact that the plaintiff exhibited numerous injuries and was continuing to ask for further medical attention.  The affidavit of fellow prisoner, Jeffery DeFee, corroborates the plaintiff's version of the facts in this regard by stating that he (DeFee) observed the plaintiff with a "swollen busted eye," a swollen face, bleeding, and coughing up blood as the plaintiff was being led out to the cage.  DeFee testifies that he heard the plaintiff asking officers for medical attention at the time he was being taken to the outside area.  Therefore, based upon the record as presently presented, a reasonable jury could conclude that correctional officer defendants Landers, Jones, and Marcano delayed and/or interfered with the plaintiff's need for further medical attention.  As such, the magistrate judge recommends that these defendants' motion for summary judgment on the medical claim be denied.[30]

In *Estelle*, *supra*, the Supreme Court recognized that deliberate indifference to a prisoner's serious medical need constitutes the unnecessary and wanton infliction of pain, "whether the indifference is manifested by prison doctors in their response to a prisoner's

---

[30]Officer Denson, testifies without refute that he did not have any physical contact with the plaintiff, and that he has no knowledge of what happened to the plaintiff after he was escorted from the shakedown area.  (Doc. 18-13).  Accordingly, the magistrate judge recommends that summary judgment be granted Officer Denson on all claims and that he be dismissed with prejudice from this action.

needs *or by prison guards in intentionally denying or delaying access to medical care*." 429 U.S. at 104-05 (emphasis added).  In this instance, genuine issues of fact exist with respect to whether the defendants denied the plaintiff adequate care for his alleged injuries by requiring him to remain in the outdoor cage despite his repeated requests "to every officer that passed" that he needed medical help.  The affidavit of fellow prisoner DeFee states that he observed the plaintiff with a "swollen busted eye," a swollen face, bleeding, and coughing up blood as the plaintiff was being led out to the cage.  (Doc. 43 at 21-22).  DeFee testifies that he heard the plaintiff asking officers for medical attention and being told that his "stupid ass ain't going back to the infirmary until [he] sits on a bucket."  (*Id*. at 22).  Furthermore, there remains an issue of fact with respect to the plaintiff's allegation that nurses in the infirmary were overruled by correctional officers with respect to the plaintiff's need to remain there because of his injury.  As presently presented, the record reflects that a reasonable jury could conclude that the correctional officer defendants delayed and/or interfered with the plaintiff's need for further medical attention for serious injuries. As such, the undersigned recommends that the defendants' motion for summary judgment on this claim be denied.[31]

---

[31]The one exception to this recommendation is Officer Denson, who testifies without refute that he did not have any physical contact with the plaintiff, and that he has no knowledge of what happened to the plaintiff after he was escorted from the shakedown area.  (Doc. 18-13).  Accordingly, the undersigned recommends that summary judgment be granted Officer Denson and that the claims against him be dismissed with prejudice.

**D.    Conditions of confinement claim**

It is undisputed that the plaintiff was placed in an outside cage on orders from Lieutenant Morris at approximately 1:30 p.m. on August 13, 2011, clothed only in his underwear, and with no bed or chair on which to sit or recline and no toilet or running water. Is also undisputed he remained in that cage until approximately midnight without any further medical attention.  Although the defendants deny the plaintiff was limited to one cup of water during this entire time, or that he was covered in blood or feces, the plaintiff has created genuine issues of fact by stating unequivocally that he "was given one (1) small styrofoam cup of water to drink the entire time [he] was held in the outside cage in the sun and heat of August," and by asserting in his sworn complaint that he remained in the outside cage covered in his own blood and feces without an opportunity to shower.  (Doc. 1 at 6; Doc. 48 at 9).  Combined with the fact that he was forced to sit for several hours without protection in the hot sun of August, and that he was suffering from at least one serious injury, it is clear that a reasonable jury could find the plaintiff was subjected to conditions of confinement which resulted in unnecessary pain and suffering.

The plaintiff has named several defendants who were aware of the conditions in which he was placed.  Defendants Jackson, Dakin, and Hopkins were each assigned to watch over the plaintiff during some portion of the time he was in the cage.[32]  Defendants Scott, Gray, and Northcutt came on duty at 6:00 p.m., but it is undisputed that they were aware the

---

[32]Defendant Hopkins denies he was assigned specifically to watch over the plaintiff, but instead was the "rover" assigned to the segregation area.  However, he acknowledges he stopped by the cage from time to time and observed the conditions in which the plaintiff was placed, and acknowledges the plaintiff complained of his side being sore.  (Doc. 18-4).

plaintiff had been placed in the outside cage.  None of these defendants dispute the plaintiff was subjected to the sun and heat of August dressed only in boxer shorts, or that the cage contained no mattress, chair, toilet, or running water.  Furthermore, these defendants either acknowledge or fail to refute that the plaintiff was told he would remain in the cage until he defecated, and that he in fact remained in the cage for approximately eight hours or more.  There also remains a genuine dispute with regard to the plaintiff's contention that he was ignored each of the "numerous times" he asked defendants Scott, Gray, and Northcutt to be allowed to go to a dry cell, to be given water, and to be allowed to shower to remove the blood and feces from his body.

Although not involving the exact factual situation as presented here, the holding of the Supreme Court in *Hope v. Pelzer*, 536 U.S. 730 (2002), is instructive to this court's evaluation of the plaintiff's conditions of confinement claim.  In *Hope*, the plaintiff, a prisoner at an Alabama Department of Corrections facility, was handcuffed to a hitching post as punishment for engaging in a argument while on an outdoor work gang. The Supreme Court stated unequivocally that the use of the hitching post, which subjected the prisoner to unnecessary pain caused by a restrictive condition of confinement for a seven-hour period, unnecessary exposure to the heat of the sun, prolonged thirst, and deprivation of bathroom breaks, "violated the basic concept underlying the Eighth Amendment [which] is nothing less than dignity of man."  536 U.S. at 738 (quoting *Trop v. Dulles*, 356 U.S. at 100 (1958) (internal quotations omitted)).  The Court recognized that this sort of "punitive treatment"

gratuitously inflicted the type of "wanton and unnecessary pain" clearly prohibited by Supreme Court precedent. *Id.*

Although he wasn't handcuffed to a hitching post, the plaintiff's allegations here are sufficiently similar to those which the Supreme Court in *Hope* recognized as "a clear violation of the Eighth Amendment." 536 U.S. at 741. The plaintiff was not only subjected to the same sort of "discomfort and humiliation" that the Supreme Court condemned in *Hope*, but he was allegedly exposed to the additional indignity of having to sit for a prolonged period of time covered in his own blood and feces.[33] Furthermore, he was subjected to these conditions while suffering from injuries incurred in the prior incident. The defendants' denials of the plaintiff's sworn allegations simply create issues of fact to be decided at trial. Accordingly, the magistrate judge recommends the motion for summary judgment on behalf of defendants Morris, Jackson, Dakin, Hopkins, Scott, Gray, and Northcutt be denied with respect to the plaintiff's conditions of confinement claim.

## RECOMMENDATION AND NOTICE OF RIGHT TO OBJECT

Accordingly, for the reasons stated above, the magistrate judge **RECOMMENDS** as follows: (1) Officers Landers and Jones' motion for summary judgment be **DENIED** with respect to the excessive force claim; (2) Nurses Thomas and Johnson's motion for summary judgment be **DENIED** with respect to the denial of adequate medical care claim; (3) Officers

---

[33]"Exposure to human waste, like few other conditions of confinement, evokes both the health concerns emphasized in *Farmer* and the more general standards of dignity embodied in the Eighth Amendment." *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001); *citing McCord v. Maggio*, 927 F.2d 844, 848 (5th Cir. 1991). *See also LaReau v. MacDougall,* 473 F.2d 974, 978 (2nd Cir. 1972) ("Causing a man to live, eat and perhaps sleep in close confines with his own human waste is too debasing and degrading to be permitted"); and *Hope,* 536 U.S. at 738 n.8.

Landers, Jones, and Marcano's motion for summary judgment be **DENIED** with respect to the denial, delay, and/or interference with medical care claim; and (4) Officers Morris, Jackson, Dakin, Hopkins, Scott, Gray, and Northcutt's motion for summary judgment be **DENIED** with respect to the conditions of confinement claim.

The magistrate judge **further RECOMMENDS** the motion for summary judgment on behalf of Officer Denson be **GRANTED** and the claims against Officer Denson be **DISMISSED WITH PREJUDICE**.

Any party who objects to this report and recommendation must, within fourteen (14) days of the date on which it is entered, file specific written objections with the clerk of this court. Any objections to the failure of the magistrate judge to address any contention raised in the petition also must be included. Failure to do so will bar any later challenge or review of the factual findings or legal conclusions of the magistrate judge. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (*en banc*). In order to challenge the findings of the magistrate judge, a party must file with the clerk of the court written objections which shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection. A copy of the objections must be served upon all other parties to the action.

Upon receipt of objections meeting the specificity requirement set out above, a United States District Judge shall make a *de novo* determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject,

or modify in whole or in part, the findings or recommendations made by the magistrate judge. The district judge, however, need conduct a hearing only in his discretion or if required by law, and may consider the record developed before the magistrate judge, making his own determination on the basis of that record.  The district judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Objections not meeting the specificity requirement set out above will not be considered by a district judge.

A party may not appeal a magistrate judge's recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  Appeals may be made only from a final judgment entered by or at the direction of a district judge.

The Clerk is **DIRECTED** to serve a copy of this report and recommendation upon the plaintiff and upon counsel for the defendants.

**DONE**, this the 3rd day of July, 2014.

JOHN E. OTT
Chief United States Magistrate Judge